UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SABRINA LIMON,

                     Petitioner,

          v.

DIRK WILLIAMS, Acting Warden,

                     Respondent.

No.  1:24-cv-00316-KES-SKO (HC)

**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**

**[THIRTY-DAY OBJECTION DEADLINE]**

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.  As discussed below, the Court finds the petition to be without merit and recommends it be **DENIED.**

**I.       PROCEDURAL HISTORY**

On October 5, 2017, a Kern County jury found Petitioner guilty of one count of first degree murder (Cal. Penal Code § 187), one count of conspiracy to commit murder (Cal. Penal Code § 182(A)(1)), one count of solicitation to commit murder (Cal. Penal Code § 653F(B)), and one count of being an accessory to murder (Cal. Penal Code § 32).  (Doc. 10-22 at 89-92.[1])  On February 21, 2018, Petitioner was sentenced to an indeterminate term of 25 years to life, plus a

---

[1] Citations are to ECF pagination unless otherwise noted.

consecutive determinate term of 16 months.  (Doc. 10-22 at 89-92.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  (Doc. 10-22 at 98.)  On October 17, 2022, the Fifth DCA affirmed the judgment. People v. Limon, 2022 WL 9799466 (Cal.Ct.App. 2022), *as modified on denial of reh'g* (Nov. 3, 2022).  Petitioner then petitioned for review in the California Supreme Court. (Doc. 10-33.)  On January 11, 2023, the California Supreme Court summarily denied review. (Doc. 10-34.)

On March 15, 2024, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.)  Respondent filed an answer on May 17, 2024. (Doc. 11.)  Petitioner did not file a traverse.

## II.    FACTUAL BACKGROUND[2]

In this case, the jury had to make a credibility determination. Jonathan Hearn (Hearn) testified that Petitioner wanted him to kill her husband (Robert) and they conspired to commit this murder. Petitioner, on the other hand, claimed that Hearn had acted alone, and she had no knowledge that Hearn was going to kill Robert.

### A.    Hearn's Agreement with the Prosecution

Prior to testifying in this matter, Hearn was charged with premeditated murder, and he faced a prison sentence of life without the possibility of parole. In or about January of 2017, however, he reached an agreement with the prosecution to testify against Petitioner. In exchange, Hearn was offered a prison sentence of 25 years and four months based on a conviction of voluntary manslaughter with a firearm enhancement. He also pleaded to other charges.[3]

### B.    Petitioner's Open Marriage and her Affair with Hearn

Petitioner, who was born in 1979, started dating Robert when she was 18 years old. They were married almost three years later. The jury learned that, around 2008, Petitioner and Robert

---

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts in Limon, 2022 WL 9799466, at *1-6.  See Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

[3] Hearn was originally charged with first degree murder, along with a special circumstance allegation of lying in wait. He initially faced an indeterminate prison sentence of life without the possibility of parole or death, but the prosecution waived the death penalty before the plea agreement was reached. It was the victim's family who first suggested that authorities should attempt to reach a plea agreement with Hearn in exchange for Hearn's truthful testimony against Robert.

"opened" their marriage and they began engaging in sexual activities with another couple. Over time, Petitioner and Robert engaged in sexual activities with other couples. Petitioner told the jury that, once she and Robert opened up their marriage, she felt that their "sacred bond" had been broken.

In 2012, Petitioner started an affair with Hearn. She told the jury that her affair with Hearn started because of what was lacking in her marriage. At some point, Robert discovered some communications between Petitioner and Hearn, and Robert told Petitioner to stop seeing Hearn. On one occasion, Robert spoke with Hearn on the telephone, telling Hearn to stay away from Petitioner. Hearn and Petitioner stopped seeing each other for a short period of time. However, by the summer of 2013, their affair resumed.

Hearn told the jury that, during his affair with Petitioner, she had complained to him about how Robert had opened up their marriage. According to Hearn, Petitioner had complained that Robert "was pretty exploitative" of her, and Robert was "objectifying" her. Hearn told the jury that, during the course of his affair with Petitioner, they began talking about killing Robert, which started as a joke. However, they eventually developed a plot to kill him.

Phone records show that, from November 2013 until March 11, 2014, Petitioner and Hearn exchanged about 526 phone calls and text messages to each other. From April 25 to June 1, 2014, they had about 1,600 calls and text messages to each other. From June 2, 2014, to September 1, 2014, they had about 5,909 calls and texts to each other. Starting on or about April 25, 2014, Petitioner and Hearn began communicating with each other primarily through a "burner" cell phone, which Hearn provided to her. They used this burner phone extensively to communicate with each other before Robert's murder on August 17, 2014.

C.      The Alleged Poisoning Attempt

Hearn told the jury that he and Petitioner originally had a plan to poison Robert. According to Hearn, he mixed arsenic trioxide into some pudding, which he gave to Petitioner.[4] She was going to put the poisoned pudding into Robert's lunch for him to eat at work. At trial,

---

[4] Law enforcement recovered a bottle of arsenic trioxide near Hearn's residence. The full bottle would have held about 100 grams, and it was about half full when it was recovered.

however, Hearn claimed that he and Petitioner had developed concerns that law enforcement would be suspicious of their relationship, especially their contact through their cell phones.[5] Hearn stated he told Petitioner to hold off on the poisoning attempt.

At trial, Petitioner denied any knowledge of this alleged poisoning attempt. She denied ever communicating with Hearn about this plan. During closing argument, the defense asserted that Hearn's testimony lacked credibility because Petitioner had supposedly placed the poisoned pudding in her own refrigerator with her two young children in the house.

The jury did not believe Hearn regarding Petitioner's alleged role in an attempt to poison Robert. The jury acquitted her in count 4 of alleged attempted murder (§§ 664/187, subd. (a)), and acquitted her in count 5 of allegedly mingling a harmful substance in food (§ 347, subd. (a)(1)). The jury also found the following three alleged overt acts not true as part of the charged conspiracy: (1) Hearn had mixed arsenic with pudding; (2) Hearn had delivered the pudding with arsenic to Petitioner's residence; and (3) Petitioner had placed the pudding with arsenic in Robert's lunch.

D.     The Shooting

Robert worked for BNSF Railway. He typically worked full time in Barstow, California, but he would occasionally work an overtime shift at a BNSF shop in Tehachapi, California. When Robert worked at this shop, he worked alone on a 12-hour shift.

It is undisputed that, at some point during their relationship, Petitioner told Hearn about the general location of the BNSF shop in Tehachapi. It is also undisputed that Petitioner told Hearn that Robert would be working in Tehachapi on August 17, 2014.[6]

On August 16, 2014, Petitioner learned that Robert would work in Tehachapi the following day. On August 17, 2014, Hearn drove on his motorcycle to Tehachapi from Hesperia, California, where he lived. It was about a two-hour drive from Hesperia to Tehachapi. Hearn

---

[5] According to Hearn, the alleged poisoning attempt occurred before he provided Petitioner with the burner cell phone.

[6] Petitioner concedes in her opening brief that she told Hearn the "general location" of Robert's workplace in Tehachapi. She also concedes that she told Hearn that Robert would be working there during the day on August 17, 2014.

confronted Robert inside the BNSF shop in Tehachapi. He shot Robert twice at close range with a handgun.

A coworker coming to relieve Robert from his shift discovered Robert's lifeless body and called 911. Law enforcement was dispatched to the scene at approximately 6:47 p.m. on August 17, 2014.[7]

Law enforcement obtained surveillance footage from cameras in the area, and a potential suspect was identified. This suspect was recorded driving a motorcycle on a road in the area at around 4:15 p.m. and 4:21 p.m. This suspect was seen walking near the BNSF shop at about 5:21 p.m. and leaving that area on foot at around 5:38 p.m. The suspect was recorded driving his motorcycle at about 5:48 p.m. on a road leading away from this area. It was impossible for law enforcement to identify the suspect from the surveillance footage.

E.      Petitioner Hides Her Affair from Law Enforcement

Petitioner repeatedly lied to law enforcement about her relationship with Hearn. On the night of Robert's murder, she falsely told Detective Robert Meyer that she was not having an affair. She continued this lie in subsequent interviews with various law enforcement officials, denying any infidelity on her part or having a boyfriend.[8]

F.      The Phone Records before and after the Day of the Murder

In the two weeks leading up to this murder on August 17, 2014, phone records show that Petitioner and Hearn often communicated. From August 1 through August 13, 2014, they exchanged 1,605 text messages. From August 14 through August 15, 2014, they exchanged 204 text and multimedia messages. On August 16, 2014, they exchanged 93 text messages.

Phone records show that Petitioner and Hearn spoke to each other multiple times on the telephone on the day of Robert's murder. Between about 6:30 a.m. and 8:10 a.m., Hearn called Petitioner's burner phone three times, totaling about 36 minutes. At 8:11 a.m., Hearn called

---

[7] Robert was likely killed sometime after 5:00 p.m. Another BNSF employee saw Robert that day working on a train that had experienced a mechanical problem while in route through the Tehachapi area. The other worker briefly spoke with Robert sometime between 4:00 p.m. and 5:00 p.m. that day. It is apparent that Robert drove back to the Tehachapi shop after working on this train.

[8] Petitioner also lied to law enforcement officials multiple times about the status of her marriage. She denied having an open marriage.

Petitioner and they spoke for about 33 minutes. At 8:47 a.m., Hearn called Petitioner and they spoke for about 46 minutes. At about 10:07 a.m., they had a 19-minute call. At about 12:05 p.m., Petitioner called Hearn, and they spoke for about 80 minutes.

Hearn claimed to the jury that Petitioner had known he was going to drive to Tehachapi that day to confront Robert. He claimed that they had discussed how he had altered his motorcycle to avoid detection, and she had told him to be careful because Robert would likely put up a fight. In contrast, Petitioner told the jury that, when she spoke with Hearn that morning, he never said he was going to kill her husband. She denied discussing killing Robert or knowing about his plan. Petitioner testified that it was "nothing out of the ordinary" to speak with Hearn this much on the telephone.

On the day of Robert's murder, phone records show that text messages were sent between Petitioner's burner phone and Hearn's cell phone at various times, including at 1:26 p.m., 4:22 p.m., 5:01 p.m., 5:04 p.m., and 6:57 p.m. Two text messages were sent from Hearn to Petitioner's burner cell at 7:50 p.m. At about 7:50 p.m., Petitioner called Hearn. From 7:50 p.m. to 8:37 p.m., they exchanged four text messages. At 8:37 p.m. Hearn called Petitioner's burner phone. From 8:38 p.m. on the night of Robert's murder, until 6:48 a.m. the following morning, Petitioner and Hearn exchanged 56 text messages.

In the days following Robert's murder, Petitioner and Hearn remained in contact. On August 18, 2014, Petitioner and Hearn exchanged approximately 97 text messages. From August 19 to August 22, 2014, they exchanged about 312 text messages, with one multimedia text. On August 21, 2014, they spoke on the phone for about 134 minutes. From August 23 to August 27, 2014, they exchanged about 307 text and multimedia messages. On August 28, 2014, they exchanged 55 text messages, and on August 29, 2014, they exchanged 53 text messages. On August 30, 2014, they exchanged 30 text messages, and on August 31, 2014, they exchanged 95 text messages.  In total, Petitioner and Hearn exchanged about 2,493 text and multimedia messages from August 1 to August 31, 2014. During that same time span, they had about 120 telephone calls.

1

G.      The Wiretaps and Police Surveillance

2      About two weeks after Robert's murder, law enforcement was alerted by certain

3 individuals about Hearn's involvement in Petitioner's life. These individuals were a couple with

4 whom Petitioner and Robert had engaged in sexual activities. Law enforcement began to focus on

5 Hearn, subpoenaing his cell phone records on or about August 29, 2014. Around the first week of

6 November 2014, law enforcement began a wiretap operation to monitor Petitioner's and Hearn's

7 communications. Law enforcement also surveilled them. Through the surveillance, law

8 enforcement believed that Petitioner and Hearn were in a relationship.

9      Law enforcement recorded numerous conversations between Petitioner and Hearn, and

10 some of the recordings were played at trial. During some conversations, Petitioner made

11 statements that could be interpreted as showing she was happy that law enforcement had not

12 identified anyone through deoxyribonucleic acid (DNA) testing, and she was pleased that law

13 enforcement was not making significant progress in identifying the suspect.

14      During a conversation recorded on November 11, 2014, Hearn told Petitioner that DNA

15 could be the thing that sets us free. That is the thing that shows that we're not involved, you

16 know? That could be the thing." Petitioner responded, "Yeah—yeah—yeah." A short time later,

17 Hearn commented that it felt like law enforcement might use the DNA as leverage. According to

18 Hearn, it felt like Meyer "looked at phone records and realized we're in an affair and now [he]

19 wants to just like bully you into saying that we're involved with that part you know with a ... with

20 a murder now." Petitioner said, "Right." Later, Petitioner asked Hearn whether law enforcement

21 could publicize their affair. Hearn believed it could be publicized if it was tied to this crime.

22 Petitioner noted that if it was true about the DNA, "then that is our saving—that's right there, you

23 know? It's like okay good, you know?"

24      During a call recorded on November 13, 2014, Petitioner and Hearn discussed what they

25 believed to be law enforcement's progress on the DNA analysis of two sweat drops allegedly

26 recovered from the murder scene. Petitioner relayed to Hearn her understanding that the source of

27 one drop had been identified as "a railroad guy," while the source of the other one had not been

28 identified. Petitioner described law enforcement's inability to identify the source of the other drop

7

as "a good thing."

At times, both Petitioner and Hearn expressed concern that law enforcement might be listening in on their conversations or watching them. Hearn expressed paranoia to Petitioner that law enforcement might discover his secret relationship with her. On one occasion, Hearn called Petitioner using an internet service provider rather than his real cell phone number in an attempt to see if law enforcement was monitoring their conversations.

Petitioner consistently kept Hearn apprised on how the investigation was proceeding. She often called Hearn just after speaking with Meyer, or in anticipation of meeting with Meyer. On occasion, Hearn would advise Petitioner on what she should say when meeting with Meyer. During one recorded call, Hearn prayed with Petitioner for her to "have the right words" when speaking with Meyer about the investigation. Hearn and Petitioner prayed for Petitioner "to not give too much information that needs to be shared."

On November 17, 2014, Meyer told Petitioner that, based on some surveillance footage, it appeared that the suspect was "a white male" who was skinny and riding a motorcycle. The suspect was possibly named "Jon, J-O-N" and possibly knew Robert. Meyer asked Petitioner if she had any pertinent information to share, or knew how law enforcement should proceed. Instead of informing law enforcement about Hearn, Petitioner gave Meyer the name of two males named "John" who had worked with Robert. At trial, the prosecution established that neither of these males matched the description of the suspect that Meyer had given to Petitioner.

Almost immediately after having this conversation with Meyer regarding the potential suspect, Petitioner called Hearn and asked him to call her from his station phone.[9] He called her back, and she told him about the phone call with Meyer. Hearn said it sounded like someone was trying to frame them. He prayed with Petitioner, asking for God's help and expressing concern that someone was trying to frame him because of his affair.

On November 18, 2014, Hearn informed Petitioner that he had talked to some lawyers that morning. She agreed to help him with money for a legal retainer.

---

[9] Hearn worked as a firefighter.

H.      Petitioner is Arrested

Law enforcement arrested Petitioner on November 18, 2014.[10] After her arrest, Petitioner told law enforcement about her relationship with Hearn. She said she had kept the affair hidden because she was "ashamed."

After her arrest, Petitioner initially told law enforcement that she did not believe Hearn had killed Robert. She did not believe Hearn was capable of murder. In subsequent interviews, however, she eventually admitted that she had known "[s]hortly" after this murder that Hearn had "possibly" done it. When asked why she had not informed law enforcement if she had known Hearn was responsible, Petitioner responded that she had not wanted it "to be true." She later admitted that, as of November 9, 2014, she had known Hearn had killed Robert.

Petitioner agreed that Hearn had coached her regarding what to say to law enforcement. She agreed that she thought Hearn was concealing their affair because it would point to him. She was asked again how soon after Robert's death had she known Hearn had done it. She answered, "Within ... not that long." When pressed on a time frame, she said it was "pretty quick."

I.      Petitioner Is Released From Custody in November 2014 and Charges were Filed Against Her in January 2017

On or about November 20, 2014, law enforcement released Petitioner from custody. No charges were filed against her at that time. Subsequently, however, Hearn reached a deal with the prosecution to testify against her. Charges were filed against Petitioner in January of 2017.

J.      Petitioner's Trial Testimony

At trial, Petitioner denied discussing with Hearn that Robert should be killed. She claimed that Hearn had acted alone and she had no knowledge that Hearn was going to kill Robert. Petitioner said she started a relationship with Hearn because of what was lacking in her marriage. Hearn would talk about God with her and pray, and she began to question her past lifestyle. She told the jury that her relationship with Hearn was "very spiritually based." She had wanted to try counseling with Robert, but he did not agree. She had discussed with Hearn her possibility of

---

[10] Hearn was separately arrested that same day.

leaving Robert. However, she told the jury that she never really considered leaving Robert, and she had just been fantasizing.

Petitioner admitted that at some point she had told Hearn about Robert's workplace in Tehachapi. She could not recall why she had told Hearn that information. She told the jury that she gave Hearn "bits and pieces" over time regarding Robert's shop in Tehachapi. She "possibly" gave him a description of the shop, but she denied giving a layout of it.

Petitioner told the jury that she had loved both men. She admitted to the jury that she had lied to Meyer about having an affair when Meyer had called her in the hours after Robert's death. She told the jury that she was "embarrassed" about the affair, and she did not want it exposed. She claimed that Hearn had told her that the affair would cast suspicion on either him or both of them. She testified that she had wanted Robert's murder to be solved, and she wished she had done things differently. She had been trying to protect her image, and she had never wanted to believe that Hearn was responsible for the murder.

Petitioner testified that she had not believed Hearn was capable of murdering Robert. She claimed she would not have been in a relationship with Hearn if she knew he had killed Robert. However, she admitted that, in her final interview with detectives, she believed Hearn had killed Robert. She told the jury that she made that admission because she believed that was what law enforcement had wanted to hear.

**III.   DISCUSSION**

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that she suffered violations of her rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1    1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

2    enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

3    filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

4    and is therefore governed by its provisions.

5              B.      Legal Standard of Review

6              A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

7    the petitioner can show that the state court's adjudication of her claim: (1) resulted in a decision

8    that was contrary to, or involved an unreasonable application of, clearly established Federal law,

9    as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

10   based on an unreasonable determination of the facts in light of the evidence presented in the State

11   court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

12   Williams, 529 U.S. at 412-413.

13             Under Section 2254(d)(1), a state court decision is "contrary to" clearly established

14   federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme

15   Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a

16   [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141

17   (2005) (citing Williams, 529 U.S. at 405-406).  This court looks to "Supreme Court holdings at

18   the time of the state court's last reasoned decision" as "the source of clearly established Federal

19   law for the purposes of AEDPA." Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005). A

20   Supreme Court precedent is not clearly established law under section 2254(d)(1) unless the Court

21   "squarely addresses the issue" in the case before the state court. Wright v. Van Patten, 552 U.S.

22   120, 125–26 (2008) (per curiam) (concluding that a state court had not unreasonably applied

23   federal law to a claim of prejudice under Strickland where the logic of petitioner's argument

24   would have required the extension of the Supreme Court's inherent prejudice doctrine to a new

25   context); Carey v. Musladin, 549 U.S. 70, 76–77 (2006) (same). While "[c]ertain principles are

26   fundamental enough that when new factual permutations arise, the necessity to apply the earlier

27   rule will be beyond doubt," Yarborough v. Alvarado, 541 U.S. 652, 666 (2004), "when a state

28   court may draw a principled distinction between the case before it and Supreme Court caselaw,

11

1    the law is not clearly established for the state-court case." Murdoch v. Castro, 609 F.3d 983, 991

2    (9th Cir. 2010). "'[I]f a habeas court must extend a rationale before it can apply to the facts at

3    hand,' then by definition the rationale was not 'clearly established at the time of the state court

4    decision.'" White v. Woodall, 572 U.S. 415, 426 (2014) (quoting Yarborough, 541 U.S. at 666).

5          In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

6    an "unreasonable application" of federal law is an objective test that turns on "whether it is

7    possible that fairminded jurists could disagree" that the state court decision meets the standards

8    set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

9    application of federal law is different from an incorrect application of federal law.'"  Cullen v.

10   Pinholster, 563 U.S. 170, 203 (2011).  The petitioner "must show far more than that the state

11   court's decision was 'merely wrong' or 'even clear error.'"  Shinn v. Kayer, 592 U.S. 111, 118

12   (2020) (quoting Virginia v. LeBlanc, 582 U. S. 91, 93 (2017) (per curiam)).  Rather, a state

13   prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's

14   ruling on the claim being presented in federal court was so lacking in justification that there was

15   an error well understood and comprehended in existing law *beyond any possibility of fairminded*

16   *disagreement*."  Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 592 U.S. at 118.  In

17   other words, so long as fairminded jurists could disagree with each other as to whether the state

18   court was correct, the state court decision is not unreasonable under AEDPA.  Congress "meant"

19   this standard to be "difficult to meet."  Richter, 562 U.S. at 102.

20         Section 2254(d)(2) pertains to state court decisions based on factual findings.  Davis v.

21   Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

22   Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

23   petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

24   facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

25   U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997).  The federal habeas

26   court must give "substantial deference" to the state court.  Brumfield v. Cain, 576 U.S. 305, 314

27   (2015). "Factual determinations by state courts are presumed correct" and the petitioner bears the

28   burden of overcoming the presumption with "clear and convincing evidence to the contrary."

1  Miller-El, 537 U.S. at 340; 28 U.S.C. § 2254(e)(1). A state court's factual finding is unreasonable

2  when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries,

3  114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied,

4  Maddox v. Taylor, 543 U.S. 1038 (2004). If "'[r]easonable minds reviewing the record might

5  disagree' about the finding in question, '. . . that does not suffice'" to prove the lower court's

6  factual determination was unreasonable. Wood v. Allen, 558 U.S. 290, 301 (2010) (alteration in

7  original) (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)).

8      To determine whether habeas relief is available under § 2254(d), the federal court looks to

9  the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

10  Nunnemaker, 501 U.S. 979, 803 (1991); Andrews v. Davis, 994 F.3d 1042, 1107 (9th Cir. 2019)

11  (en banc).  "[A]lthough we independently review the record, we still defer to the state court's

12  ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

13      The prejudicial impact of any constitutional error is assessed by asking whether the error

14  had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

15  Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

16  (holding that the Brecht standard applies whether or not the state court recognized the error and

17  reviewed it for harmlessness).

18      C.     Review of Petition

19      Petitioner presents the following four grounds for relief: 1) The trial court erred in

20  denying Petitioner's motion for judgment of acquittal because the testimony of accomplice Hearn

21  was not corroborated; 2) The evidence was insufficient to support the convictions for first degree

22  premeditated murder, conspiracy to commit murder, and soliciting another to commit murder; 3)

23  The trial court failed to take adequate steps to protect her constitutional rights to a fair trial by an

24  impartial jury by allowing the trial to be livestreamed on the internet after refusing to sequester

25  the jury; and  4) Petitioner's sentence constitutes cruel and unusual punishment in violation of the

26  Eighth Amendment.

27          1.  Claim One

28      Petitioner alleges her due process rights were violated when the trial court erroneously

13

denied her motion for judgment of acquittal because the testimony of accomplice Hearn was not sufficiently corroborated. Petitioner raised this claim on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Appellant contends that nothing corroborated Hearn's accomplice testimony that she solicited, conspired and aided in Robert's murder. [Fn.13] She seeks reversal of her convictions for murder (count 1), conspiracy (count 2) and solicitation (count 3).
>
> > [Fn.13] With CALCRIM No. 335, the jury was instructed to treat Hearn as an accomplice for all of the charged crimes. An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) Respondent correctly notes that Hearn is not an accomplice to the solicitation charged in count 3. However, the statute under which count 3 was charged has its own corroboration provision. (§ 653f, subd. (g).) Thus, respondent concedes that the alleged deficiency in corroboration for the solicitation charge in count 3 must nevertheless be addressed. We note that the jury was correctly instructed with CALCRIM No. 441 regarding the corroboration requirement specifically for the solicitation charge.
>
> > *A. Background.*
>
> At the close of the prosecution's case-in-chief, the defense moved for a judgment of acquittal (§ 1118.1) as to all counts. The motion was deferred until the close of the defense case. When the motion was heard, defense counsel stated that the motion was only addressing count 5, which charged appellant with willfully mingling a poison with food (§ 347, subd. (a)(1)). The court denied the motion, determining the jury should consider the charge in count 5. The minute order reflects that the motion pursuant to section 1118.1 was heard and denied only as to count 5.
>
> > *B. Analysis.*
>
> Appellant contends that the trial court erred when it denied her motion for judgment of acquittal regarding count 1 (murder), count 2 (conspiracy) and count 3 (solicitation). She maintains that, when Hearn's testimony is eliminated, nothing tends to connect her to the charges of murder, conspiracy, or solicitation. She asserts that she must be acquitted in counts 1, 2 and 3, and retrial is barred. We disagree.
>
> As an initial matter, appellant has forfeited this claim. In any event, we conclude that the trial court did not err in denying the motion for acquittal because Hearn's accomplice testimony was sufficiently corroborated.
>
> > *1. This claim is forfeited.*
>
> When this motion was argued below, defense counsel informed the trial court to only address count 5, which charged appellant with willfully mingling a poison with food (§ 347, subd. (a)(1)). As a result, the court did not analyze the remaining charges when it denied the motion.
>
> Appellant argues that this claim should not be deemed forfeited. According to

14

appellant, the motion was made in a timely manner as to all counts, and the court was required by section 1118.1 to grant a judgment of acquittal as to counts 1, 2 and 3 because the evidence was insufficient as a matter of law to sustain those charges. In the alternative, appellant raises ineffective assistance of counsel.

Respondent does not raise forfeiture. Instead, because appellant's motion for judgment of acquittal originally applied to all counts, respondent takes the position it is appropriate to review the merits of this claim.

We disagree with both parties and we determine that this claim is forfeited. In general, a defendant is not required to articulate specific grounds in a motion for acquittal. (*People v. Cole* (2004) 33 Cal.4th 1158, 1213; *People v. Belton* (1979) 23 Cal.3d 516, 521–522.) However, when a defendant directs his acquittal motion only to specific counts or enhancements, the trial court may limit its attention to the evidence bearing on the counts or enhancements specified in the motion, and need not test every charge and allegation for sufficient evidentiary support. (*People v. Goss* (1992) 7 Cal.App.4th 702, 707; *People v. Ceja* (1988) 205 Cal.App.3d 1296, 1303–1304.)

Here, although the acquittal motion originally applied to all counts, defense counsel specifically directed the court to consider only the charge in count 5. As such, the claim that appellant now raises on appeal must be deemed forfeited. She focused the court away from analyzing the sufficiency of the evidence as to the charges in counts 1, 2 and 3. Thus, she cannot argue that the court erred in failing to conduct an analysis it was not asked to conduct. (See *People v. Partida* (2005) 37 Cal.4th 428, 435.) Accordingly, this claim is deemed forfeited. In any event, however, we also conclude that this claim fails on its merits. [Fn.14]

> [Fn.14] Because we also address and reject this claim on its merits, we need not address any alleged ineffective assistance of counsel because appellant cannot show she was prejudiced by her trial counsel's performance. (See *People v. Holt* (1997) 15 Cal.4th 619, 703 [defendant not entitled to relief on claim of ineffective assistance of counsel where he made insufficient showing as to prejudice].)

2.     *The trial court did not err.*

Despite asking the trial court to focus on count 5 when the motion for judgment of acquittal was argued below, appellant contends that the court should have granted the motion for counts 1, 2 and 3 as a matter of law. According to appellant, Hearn's testimony was not sufficiently corroborated to support those charges. We disagree.

The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction. (*People v. Huggins* (1997) 51 Cal.App.4th 1654, 1656.) The question is whether substantial evidence exists for each element of the charged offense. (*Ibid.*) We independently review a trial court's ruling under section 1118.1. (*People v. Cole, supra,* 33 Cal.4th at p. 1213.) A motion under section 1118.1 made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

We review de novo whether an accomplice's testimony was sufficiently

15

corroborated. (*People v. Pedroza* (2014) 231 Cal.App.4th 635, 650.) Such evidence must tend to connect the defendant with the commission of the offense, but it does not need to corroborate every fact to which the accomplice testified. (§ 1111; *People v. Perez* (2018) 4 Cal.5th 421, 452.) Corroborating evidence may be circumstantial or slight, and it is entitled to little consideration when standing alone. (*People v. Perez, supra*, 4 Cal.5th at p. 452.) "The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) The evidence must be viewed in the light most favorable to the judgment, and witness credibility is not considered. (*People v. Pedroza, supra*, 231 Cal.App.4th at p. 650.)

To show a lack of corroboration, appellant relies on *People v. Braun* (1939) 31 Cal.App.2d 593 (*Braun*). This opinion does not assist her.

In *Braun*, the appellate court reversed the defendant's judgment due to insufficient corroboration of an accomplice's testimony. (*Braun, supra*, 31 Cal.App.2d at p. 605.) The defendant had associated with the actual perpetrators of the charged crimes, and the trial evidence had suggested that the defendant had had an opportunity to participate in those crimes. (*Id*. at p. 601.) According to the *Braun* court, however, these circumstances only raised a suspicion of guilt that the defendant had advised, encouraged and participated in the crimes. (*Ibid*.) When the accomplice's testimony was ignored, the remaining evidence did not provide substantial proof that the defendant "either advised or encouraged the commission of the robbery in question." (*Id*. at p. 602.)

Appellant contends that, similar to *Braun*, nothing shows that she advised or encouraged the commission of this murder apart from Hearn's testimony. We disagree. As we explain below, evidence connects appellant to this murder even when Hearn's testimony is not considered. *Braun* is distinguishable and it does not establish error.

> ### a. Appellant is connected to this murder because she informed Hearn about Robert's unique work schedule.

It is undisputed that, at some point during their relationship, appellant told Hearn about Robert's general work location in Tehachapi. It is also undisputed that appellant learned on August 16, 2014, that Robert would work in Tehachapi the following day, and she gave this information to Hearn. [Fn.15] Robert occasionally worked in Tehachapi and, when he did, he was alone.

> [Fn.15] Appellant concedes in her opening brief that she told Hearn the "general location" of Robert's workplace in Tehachapi. Appellant also concedes that she told Hearn that Robert would be working there during the day on August 17, 2014.

These facts corroborate Hearn's testimony that appellant had knowledge of Hearn's plan to kill Robert, and that she encouraged Hearn to commit this murder. It was appellant who informed Hearn where Robert generally worked in Tehachapi and, critically, it was appellant who told Hearn about Robert's unexpected and previously unscheduled shift in Tehachapi on August 17, 2014. This information directly connects appellant to this crime because, without this information, Hearn would not have known he could drive about two hours to Tehachapi that day and confront Robert alone at his place of work. This evidence strongly suggests that Hearn was telling the truth.

16

We reject appellant's argument that we must find direct corroboration of her specific criminal intent. To the contrary, section 1111 requires that the testimony of an accomplice be corroborated by evidence that merely tends to connect the defendant with the commission of the offense. As such, we will not require more than what the statute expressly states. Because it is undisputed that appellant told Hearn where to find Robert, and she provided Hearn with information about Robert's change in work schedule, evidence apart from Hearn's testimony connected her to the commission of this murder.

Appellant focuses on an evidentiary conflict that existed regarding when Hearn learned that Robert would be working in Tehachapi on that fatal day. Hearn told the jury that he had known *one or two weeks earlier* that Robert would be working in Tehachapi on the day that he killed Robert. As appellant notes, however, Hearn's recollection in this regard was impeached at trial. It is undisputed that Robert was asked to cover this shift the day before. As a result, Hearn must have learned about Robert's unexpected shift in Tehachapi no earlier than the day before this murder took place.

Appellant suggests that, because of this evidentiary discrepancy, corroboration cannot exist. Appellant acknowledges that this court cannot reweigh credibility, but she argues that we should reject those portions of Hearn's testimony where "he shifted blame for the murder to appellant." She contends that his testimony is highly suspicious and designed to save himself.

Appellant's arguments are unpersuasive. Although Hearn's recollection at trial in this regard was clearly erroneous, that does not alter our conclusion that sufficient corroboration occurred. Regardless of Hearn's inability to recall accurately when he was told that Robert would be working in Tehachapi on August 17, 2014, it is overwhelmingly apparent it was appellant who provided Hearn with this information. Thus, sufficient corroboration exists because it was clearly appellant who informed Hearn about Robert's new and unique work schedule. Therefore, evidence exists apart from Hearn's testimony which directly connects appellant to Robert's murder.

Finally, appellant disputes the significance of the fact that she told Hearn the general location of Robert's worksite in Tehachapi. Some trial evidence suggested it was very difficult to find this shop because it was not prominently marked. This worksite was an industrial shop within a series of commercial buildings. Most of the other shops were also not marked. [Fn.16]

> [Fn.16] Hearn testified that, in May 2014, he went on a scouting trip to Tehachapi in an effort to find the BNSF facility. At trial, he claimed that he informed appellant during a telephone call that he was searching for Robert's worksite that day. During this scouting trip in May 2014, Hearn located the BNSF facility and took photographs of it with his cell phone. Hearn told the jury that, while he was driving home that day, he told appellant he had located Robert's workplace in Tehachapi. Appellant argues in her opening brief that nothing independently connects her with this particular testimony and evidence. We agree with appellant in that regard. No independent evidence links appellant to Hearn's scouting trip in May 2014.

Appellant argues that the BNSF shop's location in Tehachapi can be easily found on the Internet. [Fn.17] This argument does not alter our conclusion that sufficient

corroboration exists. Regardless of whether or not Hearn could have found the shop without appellant's assistance, it is undisputed that she did inform Hearn of the shop's general location, and she gave Hearn the critical information that Robert would be working there on August 17, 2014. Her decision to provide this information connects her to the charges of murder (count 1); conspiracy to commit murder (count 2); and solicitation for this murder (count 3). As we discuss below, however, this is not the only evidence that provides corroboration of Hearn's accomplice testimony. The totality of the circumstances surrounding appellant's actions, along with evidence of her motive for Robert's death, further support a finding of corroboration.

> [Fn.17] Appellant has not asked this court to take judicial notice of this information. Accordingly, we make no findings in this regard.

### *b. The totality of the circumstances supports a finding of corroboration.*

Appellant's overall conduct and her relationship with Hearn may be considered when examining whether corroboration exists. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32.) The totality of appellant's conduct and her relationship with Hearn provides additional corroboration connecting her to the murder.

Appellant repeatedly lied to law enforcement. She was asked multiple times if she was having an affair, and she consistently failed to disclose her relationship with Hearn until she was arrested in November 2014. As appellant concedes, her lies reasonably suggest a consciousness of guilt. When coupled with the information that she provided to Hearn regarding where and when to find Robert, a reasonable inference may be drawn that appellant had an intent to kill.

During a recorded interview after she was arrested, Meyer expressed concern to appellant about how Robert must have felt when Hearn suddenly appeared at his workplace with a gun. In response to Meyer's statements, appellant replied that she had "just wanted to know if he suffered. And, he said he didn't suffer."

Respondent contends that appellant's response to Meyer shows, or at least suggests, that she had talked to Hearn about this murder. [Fn.18] In contrast, appellant asserts that her statement to Meyer is open to various interpretations and it does not necessarily indicate that she knew in advance that Robert's murder would occur. Although appellant's statement is subject to different interpretations, a reasonable inference may be drawn from it that appellant had talked to Hearn about the manner of Robert's death. When coupled with other evidence in this record, appellant's statement about knowing that Robert did not suffer strongly suggests she was part of a plot to commit this murder.

> [Fn.18] Meyer did not ask appellant what she had meant.

Other examples exist. Before she was arrested, law enforcement began to surveil both Hearn and appellant. A wiretap operation was started to monitor their communications. Law enforcement recorded numerous conversations, and some of the recordings were played at trial. During a conversation recorded on November 11, 2014, Hearn told appellant that DNA could be "the thing that sets us free. That is the thing that shows that we're not involved, you know? That could be the thing." Appellant responded, "Yeah—yeah—yeah." A short time later, Hearn commented that it felt like law enforcement might use the DNA as leverage. According to Hearn, it felt like Meyer "looked at phone records and realized we're

in an affair and now [he] wants to just like bully you into saying that we're involved with that part you know with a ... with a murder now." Appellant said, "Right." Still later, appellant asked Hearn whether law enforcement could publicize their affair. Hearn believed it could be publicized if it was tied to this crime. Appellant noted that if it was true about the DNA, "then that is our saving—that's right there, you know? It's like okay good, you know?"

During a call recorded on November 13, 2014, appellant and Hearn discussed the DNA analysis of two sweat drops allegedly recovered from the murder scene. Appellant believed one drop had been identified as "a railroad guy," while the source of the other one had not been identified. Appellant described law enforcement's inability to identify the source of the other drop as "a good thing."

In a different exchange, Meyer told appellant that they had received a secret witness tip that they should focus on a skinny white male named "Jon, J-O-N" who drove a motorcycle and possibly knew Robert. Meyer asked appellant if she knew in which direction the investigation should proceed. Although Meyer's description matched Hearn, appellant did not name Hearn but, instead, named two former coworkers of Robert's who were named John. She then called Hearn and immediately told him to call her back from a different phone. Appellant later admitted to the police that she had done so because she was "thinking maybe someone was listening" to their calls.

These various recorded exchanges show that appellant was actively trying to conceal Hearn's identity from law enforcement. Coupled with appellant's lies and her disclosure to Hearn about where and when Robert was working in Tehachapi, reasonable inferences may be drawn that demonstrate appellant's intent to kill.

Finally, appellant admitted to detectives after she was in custody that she had known "pretty quick" after Robert's murder that Hearn had been responsible. The parties dispute whether or not this fact tends to corroborate Hearn's testimony that appellant intended for Robert to die. Appellant contends this only shows her knowledge of the murder at some point *after* it was committed. While it certainly establishes her knowledge after the fact, a reasonable inference may be drawn that she knew before Robert's murder that Hearn was going to shoot him. Indeed, the jury learned that, 19 days after Robert's murder, she texted Hearn saying how sexy he was and she adored him. Two days later she again texted him, saying how much she loved and missed him. On another occasion 25 days after Robert's murder, she texted Hearn that she had bought him something "practical" that "will one day be something we share in our home." All of these examples provide sufficient grounds for the jury to draw a reasonable inference appellant had planned Robert's murder with Hearn. A jury could reasonably conclude from the totality of the evidence that appellant would not have remained in a romantic relationship with Hearn after Hearn's involvement in Robert's murder came to light unless she had conspired with Hearn from the inception.

> c.     *Appellant had a motive for Robert's death.*

Evidence that a defendant had a motive to commit the charged crime can be used to corroborate an accomplice's testimony. (See *People v. Szeto* (1981) 29 Cal.3d 20, 28.) Here, the jury learned that appellant was not just having a physical affair with Hearn. Instead, she had intense feelings for him. Both before and after Robert's murder, she repeatedly expressed her love for him and her belief that they had a future together.

In February 2014, about six months before Robert was murdered, appellant gave Hearn a Valentine's Day card. She repeatedly wrote that she loved him, and she expressed how much he meant to her. She wrote that she loved him "for trusting me with your heart, your pride, your wisdom and soul." She also stated her love for him because she was the one "you choose to care for" and he had brought a "special meaning" to her life. She loved him "for hopes and faith in our future together." She concluded the card by stating she loved him "for so many reasons" and she had only written a few, "but in all that years bring to us, I never want you to forget that you were made for me, [and] I was made for you."

In another undated card, she again expressed her love for him. She wrote that he was her love, and he was her "amazing blessing that God has given me." She wrote that she wanted to love him "in God's love and live together in God's will." She wrote that they had been blessed by God "to have this chance ... To love each other." She wrote that she cherished his love and "the blessings" God had given them. She included a passage from the Bible describing God's love and the need to love one another.

As noted above, about 19 days after Robert's murder, appellant texted Hearn saying how sexy he was, she loved him, she adored him, and missed him. On another occasion 25 days after Robert's murder, she texted Hearn that she had bought him something they would one day share in their home.

From September 5 to September 12, 2014, appellant texted Hearn about 20 times, indicating that she loved him and missed him. On October 5, 2014, she texted Hearn that he was her "partner in this life to live for God. I'm so ready to live life fully with you. I WILL wait on God's time and trust in His plan. But I'm READY FOR US! I need you my Jonathan!!"

On October 18, 2014, she texted Hearn saying she loved him "[d]eeply" and it was a love that she had "never felt before." On November 1, 2014, she texted him about mundane tasks that she needed to accomplish. She finished her text asking how "the love of my life" was that morning.

On November 2, 2014, she texted Hearn telling him he was "such an amazing man of many God given gift's [*sic*] and talents. I feel overwhelmed by your know how, but I feel privileged to be able to be a part of you, and blessed to have your love in the many wonderful ways that I do. Thank you for giving me YOU. I cherish all of what I have with you Jonathan!"

After her arrest, appellant told Meyer that she would talk to Hearn about raising her children, and they talked about "how badly" things in her life "were being done." When speaking with other detectives, she denied feeling relieved that Robert was gone, but she admitted that she had started to build a future with Hearn. She was asked if that plan for a future was still true knowing that Hearn had killed Robert. She answered, "I just thought we were gonna [*sic*] uh, live under the Bible and live ... live right."

In addition to showing appellant's love for Hearn, the prosecution introduced evidence that strongly suggested appellant was not happy in her marriage. She disclosed to law enforcement after her arrest that Robert was often "distracted" on Web sites and his phone, and, although they remained friends, he was "somewhere else" emotionally. She told Meyer that it was "just a crazy experience" when they first opened their relationship sexually with another couple. She told Meyer that opening their relationship had caused "troubles" but Robert had told her it was

"just sexual." Appellant admitted to Meyer that she and Robert had allowed "some things" to come into their marriage that she felt had "damaged" them. She would tell Robert, but "he wouldn't hear of it." Appellant had discussed divorce with Robert stemming from the "partying and too much drinking" but everything would be "all good" the next day.

Finally, the prosecution established that appellant may have had a financial interest in Robert's death. Robert had a life insurance policy of $300,000. Per that policy, appellant received $300,591.70 in October 2014. Appellant also had an opportunity to receive a financial settlement with BNSF because Robert had died at work. In October 2014, appellant sought a "fair settlement" with BNSF. [Fn.19] As of this trial, however, no settlement was reached. [Fn.20]

> [Fn.19] Hearn claimed at trial that appellant had wanted a settlement with BNSF of around $1 million.

> [Fn.20] BNSF paid for Robert's funeral expenses up to $15,000. Appellant asked the company to donate any unused portion of that money to the church.

> ### d.     Our conclusions.

Based on this record, the trial court did not err when it failed to grant the motion for judgment of acquittal regarding counts 1, 2 and 3. It was appellant who informed Hearn about Robert's unexpected extra shift in Tehachapi on August 17, 2014. Based on that critical information, Hearn was able to drive about two hours to confront Robert when he was alone. In addition, appellant repeatedly lied to law enforcement about her relationship with Hearn, and she provided some false leads regarding potential suspects. Moreover, some of her recorded conversations with Hearn strongly suggested she was happy that law enforcement had not discovered the killer. Based on a statement appellant made to Meyer, a strong inference exists that appellant had asked Hearn whether Robert had suffered when Hearn killed him. Finally, the prosecution established that appellant was deeply in love with Hearn both before and after he killed her husband. The jury had sufficient evidence to reasonably conclude that appellant would not have remained in a romantic relationship with Hearn unless she had conspired with Hearn from the inception. Setting aside Hearn's testimony, evidence from the prosecution's case overwhelmingly and conclusively connected appellant to this murder. Thus, sufficient corroboration of Hearn's testimony occurred. [Fn.21] Therefore, the court did not err in denying the motion for judgment of acquittal, and appellant's arguments are without merit. We will not reverse appellant's judgment based on an alleged failure to corroborate Hearn's accomplice testimony.

> [Fn.21] Because appellant's claim focuses on an alleged lack of corroboration, we do not address the elements needed to establish appellant's guilt for the charges alleged in counts 1, 2 and 3. In any event, we address those elements below when resolving appellant's claims that insufficient evidence supports these convictions.

Limon, 2022 WL 9799466, at *7-14.

### a.     Procedural Default

Respondent contends Petitioner is procedurally barred from raising her claim, because the

21

state court found that Petitioner had forfeited her claim by failing to present her grounds for acquittal to the trial court.

A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991).  This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief. Id. at 730.  For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997).  For the bar to be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal court may not consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50.

The Ninth Circuit has repeatedly held that California's forfeiture doctrine is clear, well-established, has been consistently applied, and is an adequate and independent state procedural rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002); Vansickel v. White, 166 F.3d 953 (9th Cir. 1999).  Thus, by failing to articulate her grounds for acquittal based on accomplice corroboration, Petitioner waived her claim in state court and is procedurally barred from raising it here.  Nevertheless, as discussed below, the claim is without merit.

b.      Legal Standards and Analysis

To the extent Petitioner claims the trial court violated a state statutory rule in permitting conviction on uncorroborated accomplice testimony, Petitioner fails to state a federal claim, since there is no Supreme Court authority requiring that accomplice testimony be corroborated.  See United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir.1993) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless it is incredible or insubstantial on its face."); United States v. Lai, 944 F.2d 1434, 1440 (9th Cir.1991); United States v. Lopez, 803

F.2d 969, 973 (9th Cir.1986); Harrington v. Nix, 983 F.2d 872, 874 (8th Cir.1993) ("[S]tate laws requiring corroboration do not implicate constitutional concerns that can be addressed on habeas review.").

Moreover, the state court determined that there was sufficient evidence to corroborate Hearn's testimony. Specifically, Petitioner had informed Hearn of the victim's work location in Tehachapi, and she had informed Hearn that the victim's work schedule had changed such that he would be working at that location on August 17, 2014. This information directly tied Petitioner to the crime, because without this information, Hearn would not have known that the victim would be present at that certain place and time. Petitioner's conduct and the numerous recorded conversations between Petitioner and Hearn also provided strong evidence of corroboration. Some examples included: Petitioner actively misleading law enforcement in determining the identity of Hearn; Petitioner lying to law enforcement of her affair with Hearn; Petitioner's comments made evincing knowledge of the murder; and her discussions with Hearn of their future life together after the victim's murder. Thus, Petitioner fails to demonstrate that she was arbitrarily deprived of her state statutory right to have accomplice testimony corroborated. See Jones v. Arnold, 593 F.App'x 674, 675 (9th Cir. 2015) (citing Laboa v. Calderon, 224 F.3d 972, 929 (9th Cir. 2000) ("Because the state court considered Jones's section 1111 claim and found sufficient corroboration of the accomplice testimony, Jones was not arbitrarily deprived of a state law entitlement in violation of his Fourteenth Amendment due process rights.")).

In summary, the ground for relief is procedurally barred, fails to present a federal claim, and fails on the merits. It should be denied.

### 2. Claim Two

Petitioner next claims the evidence was insufficient to support the convictions of murder, conspiracy to murder, and solicitation of murder. Petitioner raised this claim on direct appeal. In the last reasoned decision, the appellate court denied the claim as follows:

*III. Substantial Evidence Supports Appellant's Conviction for Solicitation in Count 3.*

In count 3, appellant was charged with soliciting Hearn on or about and between March 19, 2014, and August 17, 2014, "to commit or join in the commission" of Robert's murder. The jury convicted appellant of this charge (§ 653f, subd. (b)).

Appellant argues that, if the trial court properly denied her motion for a judgment of acquittal as to count 3 and/or that claim was deemed forfeited, then reversal of this conviction is still warranted due to an absence of substantial evidence to establish that she requested or asked Hearn to kill Robert.

*A. Standard of review.*

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt. The evidence must be reasonable, credible and of solid value. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

*B. Analysis.*

Appellant again contends that Hearn's accomplice testimony was not sufficiently corroborated. She asserts that nothing independently shows that she solicited Hearn to kill Robert. She also argues that Hearn's testimony failed to establish the elements of solicitation. We disagree. Hearn's testimony regarding the solicitation was sufficiently corroborated, and his testimony represents substantial evidence supporting the conviction in count 3.

The crime of solicitation for murder must be proven by the testimony of two witnesses, "or of one witness and corroborating circumstances." (§ 653f, subd. (g).) The purpose of section 653f is to guard against a conviction for solicitation "based on the testimony of one person who may have suspect motives." (*People v. Phillips* (1985) 41 Cal.3d 29, 76.) The elements of solicitation are an offer or invitation to another to commit a crime, and the intent that the crime be committed. (*People v. Wilson* (2005) 36 Cal.4th 309, 328.) The crime of solicitation is complete as soon as the verbal request is made with the requisite intent, and is punishable regardless of the agreement of the person solicited or any overt act. (*Ibid.*)

In this case, Hearn's testimony and corroborating circumstances satisfy the requirements of section 653f, subdivision (g). We have already explained that the circumstances amply demonstrate appellant's involvement in Robert's murder. [Fn.22] She provided the key information to Hearn that permitted this killing to occur in Tehachapi while Robert was working alone. Further, the totality of the remaining record shows that she tried to hide her relationship with Hearn from law enforcement, and a strong inference may be drawn from the record that she knew in advance that Hearn was going to kill Robert. As such, the jury was permitted to consider Hearn's testimony in determining if the prosecution had established the crime of solicitation. (See *People v. Maldonado* (1999) 72 Cal.App.4th 588, 598 [once corroboration sufficiently establishes the accomplice's believability, the accomplice's testimony may establish many other facts not related in the independent testimony].)

> [Fn.22] The standard for corroboration under section 653f is the same as required under section 1111. Both statutes require sufficient independent evidence that tends to connect the defendant with the charged offense.

24

(*People v. MacEwing* (1955) 45 Cal.2d 218, 223–224.)

Hearn told the jury that, during his affair with appellant, they had increasingly negative discussions about Robert. Towards the end of 2013 or the beginning of 2014, they began discussing Robert's demise. It was a "joke" at first. Hearn told the jury that he could not remember who had mentioned it first, but it turned into something that materialized. It would be "simpler" if Robert were gone. According to Hearn, he and appellant had "a plot to kill her husband." They planned to conceal their crime and then have a future together, including marriage. Hearn testified that divorce was not an appealing option for appellant. Hearn told the jury that, at some point while they were using the burner phone, appellant told him to kill Robert.

Appellant argues that Hearn's testimony is insufficient to establish her solicitation for murder because he said they had *mutually discussed* Robert's demise. She also notes that, according to Hearn, she told him to kill Robert *after* the alleged poison plot had already ended and they had decided to halt their plans for three or four months. We reject these arguments. Regardless of when appellant told Hearn to kill Robert, Hearn made it clear that she asked or invited him to commit murder, and she intended for it to occur. (See CALCRIM No. 441.) [Fn.23]

> [Fn.23] The jury was instructed with CALCRIM No. 441, and told that appellant was guilty of solicitation if the prosecution proved the following: (1) appellant requested or asked or invited another person to commit or join in the commission of the crime of murder; and (2) appellant intended that the crime of murder be committed.

Reviewing the record in the light most favorable to the judgment, substantial evidence exists from which a reasonable jury could make the necessary finding beyond a reasonable doubt that appellant was guilty in count 3. We will not reweigh the evidence or reevaluate witness credibility, and we cannot reverse the judgment merely because the evidence could be reconciled with contrary findings. The evidence in this record is reasonable, credible and of solid value. Therefore, appellant's arguments are without merit and reversal of count 3 is not appropriate.

*IV. Substantial Evidence Supports Appellant's Conviction for Conspiracy in Count 2.*

In count 2, appellant was charged with conspiring with Hearn to commit murder on or about and between March 19, 2014, and November 18, 2014. The jury convicted appellant of this charge (§ 182, subd. (a)(1)).

Appellant again contends that Hearn's accomplice testimony was not properly corroborated. She argues that the evidence was insufficient to establish two elements of the charged conspiracy: (1) that she intended to agree and did agree with Hearn to kill Robert; and (2) that she intended that Hearn would intentionally and unlawfully kill. She asserts that none of the overt acts which the jury found true evidenced her intent to kill. She claims that Hearn was the "mastermind" of the plot to murder Robert, and Hearn exercised control over her. She maintains that, if the trial court properly denied her motion for a judgment of acquittal as to count 2 and/or that claim was deemed forfeited, then reversal of this conviction is still warranted due to an absence of substantial evidence to establish the elements of conspiracy. We disagree.

A criminal conspiracy exists where there is an unlawful agreement between two or more people to commit a crime, and an overt act occurs in furtherance of that

agreement. (§ 182, subd. (a)(1); *People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399.) Conspiracy is a specific intent crime, with the intent divided into two elements: (1) the intent to agree or conspire, and (2) the intent to commit the offense which is the object of the conspiracy. (*People v. Martin* (1982) 135 Cal.App.3d 710, 722.) There must be substantial evidence to show the conspirators not only intended to agree but also intended to commit the elements of the target offense. (*People v. Prevost, supra*, 60 Cal.App.4th at p. 1399.)

In this matter, the jury found true certain overt acts in support of this conspiracy, including that (1) Hearn purchased a cellular phone to escape law enforcement detection; (2) appellant used that cellular phone; (3) appellant provided information to Hearn regarding the BNSF shop location in Tehachapi; (4) appellant informed Hearn that Robert would be working in Tehachapi on August 17, 2014; and (5) Hearn shot and killed Robert on August 17, 2014.

Ample evidence from this record supports these findings, and, from them, a reasonable inference exists that appellant intended for Hearn to kill Robert, and they intended to hide their conspiracy from law enforcement. Appellant, however, asserts that other interpretations may be drawn from the evidence. She argues that she merely used the burner phone to prevent Robert from finding out about her continuing affair. She also contends that she told Hearn about Robert's work schedule so she could facilitate her affair and spend time with Hearn. She concedes that, by informing Hearn about Robert's work schedule, she "clearly aided" Hearn in carrying out *his* plan of killing Robert. However, she maintains that her "verbal acts" are insufficient to prove her intent to conspire or her intent to kill.

Appellant's various arguments are unpersuasive. Direct evidence of a defendant's intent to kill rarely exists. Thus, such intent "may be inferred from the circumstances of the crime and the defendant's acts." (*People v. Sánchez* (2016) 63 Cal.4th 411, 457.) Appellant's actions in this matter, coupled with the circumstances of the crime, sufficiently support the jury's determination that appellant held an intent to conspire with Hearn, and she intended for Hearn to kill Robert. The jurors had the exclusive role to judge all questions of fact submitted to them, including the credibility of the witnesses. (See CALCRIM No. 226; § 1127.) It is clear that the jury resolved the various credibility disputes unfavorably for appellant. Although appellant can point to other interpretations that may be drawn from the record, substantial evidence exists from which a reasonable jury could have decided beyond any reasonable doubt that appellant was guilty of conspiring with Hearn to kill Robert.

Finally, appellant asserts that, during closing arguments, the prosecutor focused on her actions after the date of the murder when asking the jury to find her guilty of conspiracy. She contends that the prosecutor likely did this because there was no evidence (aside from Hearn's testimony) to establish her intent to conspire before the murder occurred. We disagree. Regardless of how the prosecutor argued this issue to the jury, overwhelming evidence exists in this record that appellant agreed with Hearn to kill Robert, and she intended that Hearn would intentionally and unlawfully kill. We will not reverse the judgment merely because the evidence can be reconciled with contrary findings. (See *People v. D'Arcy, supra*, 48 Cal.4th at p. 293.) Substantial evidence supports the conviction for conspiracy, and this claim fails.

*V. Substantial Evidence Supports Appellant's Conviction in Count 1 for Murder.*

26

1
2
3
4
5

Based on a theory of aiding and abetting, the jury convicted appellant of first degree premeditated murder in count 1. With CALCRIM No. 401, the jury was instructed on the doctrine of aiding and abetting. The jurors were told that appellant was guilty of a crime if (1) Hearn committed a crime; (2) appellant knew that Hearn had intended to commit the crime; (3) before or during the commission of the crime, appellant intended to aid and abet Hearn in committing the crime; and (4) appellant's words or conduct did, in fact, aid and abet Hearn's commission of the crime.

6
7
8
9

Appellant concedes that the jury was "properly instructed" with CALCRIM No. 401 regarding liability under a theory of aiding and abetting. She argues, however, that her murder conviction must be reversed due to insufficient evidence. She contends that the prosecution failed to prove that she knew Hearn intended to commit the murder and/or that she intended to aid and abet Hearn in committing the crime. She again argues that Hearn's testimony was not sufficiently corroborated. These arguments are unpersuasive.

10
11
12
13
14

We have already concluded that sufficient evidence corroborated Hearn's accomplice testimony that appellant intended to kill Robert. Therefore, the jurors were free to consider Hearn's testimony and give it whatever weight they felt appropriate. The jurors had the exclusive role to judge all questions of fact submitted to them, including Hearn's credibility. (See § 1127.) Based on the verdict rendered in count 1, it is clear that the jury found portions of Hearn's testimony credible, and it rejected appellant's testimony that she had not intended to aid Hearn in committing murder. We will not disturb the jury's verdict because substantial evidence supports it.

15
16
17
18

Hearn informed the jury that appellant told him to kill Robert. Appellant provided the key information to Hearn that permitted him to find Robert alone in Tehachapi and kill him. The record amply supports the jury's determination that appellant knew that Hearn intended to kill Robert, and she intended to aid and abet Hearn in committing this murder. This evidence was reasonable, credible and of solid value. Therefore, substantial evidence supports the conviction in count 1, and this claim fails.

19
Limon, 2022 WL 9799466, at *14-17.

20
        a.     Legal Standard

21    The law on sufficiency of the evidence is clearly established.  Pursuant to the United

22  States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to

23  determine whether a factual finding is fairly supported by the record is "whether, after viewing

24  the evidence in the light most favorable to the prosecution, any rational trier of fact could have

25  found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319;

26  see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could

27  have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.

28  Jackson, 443 U.S. at 324.  Sufficiency claims are judged by the elements defined by state law.  Id.

27

1    at 324, n. 16.

2          If confronted by a record that supports conflicting inferences, a federal habeas court "must

3    presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any

4    such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.

5    Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

6    conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

7          After the enactment of the AEDPA, a federal habeas court must apply the standards of

8    Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

9    2005).  In applying the AEDPA's deferential standard of review, this Court must presume the

10   correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson,

11   477 U.S. 436, 459 (1986).

12         In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further

13   explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

14         makes clear that it is the responsibility of the jury - not the court - to decide what
15         conclusions should be drawn from evidence admitted at trial. A reviewing court
       may set aside the jury's verdict on the ground of insufficient evidence only if no
16     rational trier of fact could have agreed with the jury. What is more, a federal court
       may not overturn a state court decision rejecting a sufficiency of the evidence
17     challenge simply because the federal court disagrees with the state court. The
       federal court instead may do so only if the state court decision was "objectively
18     unreasonable."

19         Because rational people can sometimes disagree, the inevitable consequence of
       this settled law is that judges will sometimes encounter convictions that they
20     believe to be mistaken, but that they must nonetheless uphold.

21   Id. at 2.

22                          b.      Analysis

23         In rejecting the claim, the state court applied the Jackson standard.  The state court

24   reviewed the elements of each count and concluded that sufficient evidence supported each. Thus,

25   the only question before the Court is whether the state court's application was unreasonable.

26   Viewing the evidence in the light most favorable to the prosecution, it is apparent the state court

27   did not make an unreasonable determination of the facts.

28         In count 3, Petitioner was found guilty of soliciting Hearn to commit the murder of the

victim.  The elements of solicitation are an offer or invitation to another to commit a crime, with intent that the crime be committed.  People v. Wilson, 36 Cal.4th 309, 328 (2005).  Hearn testified that at some point, Petitioner told him to kill the victim.  There was also evidence that Hearn and Petitioner repeatedly discussed killing the victim.  From this, the jury could determine that Petitioner intended that the victim be killed.  Thus, there was sufficient evidence from which a rational factfinder could conclude that the elements of the offense were established.  Petitioner contends that the jury should not have believed Hearn in light of certain conflicts in the evidence, but it is not within the province of a federal habeas court to redetermine the credibility of witnesses or reevaluate the evidence.  See Cavazos, 565 U.S. at 6 (reweighing facts precluded by Jackson); United States v. Nevils, 598 F.3d 1158, 1170 (9th Cir. 2010) (in assessing sufficiency of the evidence claim, it is not court's function to reweigh the evidence) (citation and quotation marks omitted). The Court must presume that the jury rejected petitioner's interpretations of such evidence and resolved any ambiguities in favor of its guilty verdicts.  Jackson, 443 U.S. at 319 (court must view evidence "in the light most favorable to the prosecution"); see Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004) (federal habeas court must presume trier of fact resolved conflicts in favor of prosecution).

Petitioner also fails to demonstrate that the state court unreasonably determined the facts or applied Jackson unreasonably as to count 2.  Petitioner was found guilty of conspiring with Hearn to commit murder.  For the charge of criminal conspiracy, the prosecution needed to establish that Petitioner intended to agree and did agree with Hearn to kill the victim, that Petitioner intended that Hearn would intentionally and unlawfully kill the victim, and that an overt act was taken in furtherance of that agreement. Cal. Penal Code § 182(a)(1).  The appellate court noted that several overt acts supported the conspiracy, including: the purchase of a cellphone to escape law enforcement detection; the use of that cellphone; Petitioner providing information to Hearn on the whereabouts of the victim; and Hearn killing the victim.  Limon, 2022 WL 9799466, at *16.  In addition, these acts along with Hearn's testimony and their mutual discussions provided ample evidence from which a jury could infer that Petitioner intended for Hearn to kill the victim.  As noted above, Petitioner makes various arguments that the evidence

showed she only intended to hide the affair, but the Court is not tasked with reevaluating the evidence. The Court must presume that Petitioner's interpretations of the evidence were resolved against her in favor of its guilty verdict. <u>Jackson</u>, 443 U.S. at 319.

In count 1, Petitioner was convicted of first degree premeditated murder on a theory of aiding and abetting.  Petitioner contends there was insufficient evidence that she knew Hearn intended to commit the murder, and/or that she intended to aid and abet Hearn in committing the crime.  As discussed above, however, there was ample evidence from Hearn's testimony that Petitioner intended to kill the victim and that Petitioner told Hearn to kill the victim.  There was also evidence that Petitioner aided Hearn in the commission of murder.  She provided key information of the victim's whereabouts on the day of the murder.  Thus, there was sufficient evidence from which a rational factfinder could find that Petitioner aided and abetted Hearn in premeditated first degree murder.

Petitioner has failed to demonstrate that no fairminded jurist would agree with the state court's conclusion that there was sufficient evidence from which the jury could find Petitioner guilty of solicitation to commit murder, conspiracy to commit murder, and first degree murder. Petitioner fails to demonstrate that the state court rejection of her claim was contrary to, or an unreasonable application of, the <u>Jackson</u> standard, or that the state court unreasonably determined the facts in the case.  The claim should be denied.

### 3.  <u>Claim Three</u>

Petitioner contends that the trial court denied her constitutional right to a fair trial because of the media coverage in the case.  She claims the court failed to take proper steps to protect her right to a fair trial by failing to admonish the jury or taking other steps to protect the trial's fairness.  The appellate court denied the claim as follows:

> *VI. Appellant has Forfeited her Claim that her Constitutional Rights were Violated Based on the Media Coverage; This Claim also Fails on its Merits.*
>
> This trial received extensive local and national news coverage. The trial was broadcast live on the Internet. [Fn.24] Appellant argues that she did not receive a fair trial by an impartial jury. She contends that her due process rights were violated.
>
> [Fn.24] This trial is still viewable on the Internet.

30

(<https://lawandcrime.com/live-trials/ live-trials-current/sabrinalimon/watch-live-sabrina-limon-trial/> [as of Oct. 14, 2022].)

*A. Background.*

We summarize the relevant history regarding the media coverage in this case, and the admonishments that the trial court gave throughout the proceedings.

*1. The court grants media access.*

In August 2017, before the jury was selected, the defense objected to any media coverage and livestreaming of the trial. The trial court granted media requests allowing a television camera to broadcast the trial live. In September 2017, before the jury was selected, the court and counsel spoke to an NBC technical crew about how to place the recording equipment and cables strategically in the courtroom "to be unobtrusive and not create any distractions or hazards."

*2. The admonishments during voir dire.*

During voir dire, prospective jurors were asked whether or not they had "seen, read or heard anything" about this case. Prospective jurors with media exposure to the case were individually questioned away from the other potential jurors, and some of these individuals were dismissed for cause or by stipulation.

One prospective juror indicated he had first heard about the case on the television in the jury assembly room. A story aired for about two minutes discussing the charges against appellant. This prospective juror informed the court that he thought appellant was "guilty" because she was linked with Hearn. This prospective juror said he did not know if he could make his own decision based on the evidence and the law. The parties stipulated to excuse this person from service.

Another prospective juror saw a news story about this case, and he then saw the same news story air on the television in the jury assembly room. This prospective juror thought he could still be fair. The defense later exercised a peremptory challenge for this individual.

During voir dire on August 31, 2017, the trial court admonished the potential jurors, in part, that they were not allowed "to read or listen to any media coverage, if there is any. [¶] You are to base your decision only on the evidence you hear in court and only after the case has been submitted to you for deliberation." The court told the potential jurors to "change the channel" if they were watching television "and something about this case" was aired. The jurors were told to not read anything appearing in a newspaper or on the Internet about this case.

On the morning of September 6, 2017, still during voir dire, the court again admonished the group of prospective jurors, in part, that they could not "read or listen to any media coverage. You are to base your decision only on the evidence you hear in court and only after the case has been submitted to you for deliberation." That same afternoon the court admonished the prospective jurors as the proceedings concluded for the day that they were "not to read, watch, listen [to] anything about this case. Okay? [¶] If it's on the TV, turn the channel. If it's on the radio, turn the channel. If it's on the Internet, flick the button. Do something. Don't read or watch anything about this case. All right?"

### 3. The admonishments to the sworn jury.

On September 8, 2017, the alternate jurors were sworn and the jury panel was complete. The court informed the jurors that a video camera and a still camera would be in the courtroom each day. Jurors were informed that they would not be photographed, and the media had been ordered not to conduct any interviews near them "or do anything around you." The court admonished the jurors that it was "imperative that you not read, watch, or listen to anything about this case. [¶] The actual evidence is what you get here in court, not some reporter's viewpoint of what they think it is. Okay? [¶] It's what you get here in court. All right? [¶] So please don't violate that order. If you see something, turn the channel, turn off the radio. If you're on the Internet, go to ESPN. I don't think that will be on there. Okay?" A short time later, the court informed the jurors that live coverage of this trial would probably happen. The court told the jurors to "stay away" from any platform that might show this trial, and the court reiterated that the jurors should not expose themselves "to anything that is not presented to you in this court." The judge stated that the court and the parties were "[v]ery concerned" about this issue.

The jury began to hear evidence in this matter on September 11, 2017. Just before the first witness testified, the court admonished the jurors that their verdict must be based only on the evidence presented during this trial. The court cautioned the jurors to "not read, listen to, or watch any news report or commentary about the case from any source."

At the end of the day on September 14, 2017, the court cautioned the jurors that they could not "read, watch, listen to any news report or any media coverage of this case whatsoever. All right?"

At the end of the day on September 15, 2017, the court reminded the jurors "not to form or express any opinion or discuss the case. Don't read, watch, or listen to any news media of this case."

At the end of the day on September 22, 2017, the court told the jurors to not "form or express any opinion, nor discuss the case. [¶] Remember not to read, watch, or listen to any media coverage."

On October 2, 2017, the defense rested and the prosecution announced it had no rebuttal evidence. The court informed the jurors that the attorneys would give their closing arguments the next day, and the jurors would then have the case. The jurors were excused for the day. Before leaving, the court reminded them to not "form or express any opinion or discuss the case. Don't watch any media coverage."

### 4. The relevant jury instructions.

On October 3, 2017, the court instructed the jury on the law. With CALCRIM No. 124, the jurors were informed that they could not conduct any research. The jurors were also told to not use any form of electronic or wireless communication to obtain information.

With CALCRIM No. 200, the jurors were told that they must decide the facts, and that decision could only be based on the evidence presented to them at trial.

With CALCRIM No. 201, the court instructed the jurors to not use the Internet or other reference materials in any way in connection with this case, either

individually or as a group. The jurors were told to not investigate the facts of this case, either individually or as a group.

*B. Analysis.*

Appellant asserts that the trial court erred by failing to take adequate measures to protect her constitutional rights to a fair trial by an impartial jury. She notes that, during voir dire, a number of potential jurors indicated that they had read about this case and/or had seen photos related to the case on social media. She contends that the court failed to admonish the jurors sufficiently to avoid media coverage. [Fn.25] She argues that, given the pervasiveness of the media in today's digital age, it would have been difficult, if not impossible, for even a diligent juror to have avoided exposure to this trial. She maintains that, once this trial started, jurors may have revisited testimony at their leisure away from court. Appellant also claims that the court failed to ensure that witnesses did not watch live or recorded trial proceedings before they testified. She asserts it is likely witnesses may have viewed portions of the trial before testifying, and/or witnesses did not give truthful testimony because they were "performing for the camera."

> [Fn.25] Appellant argues that, between opening statements and the end of closing arguments, the court admonished the jury 55 times to not form an opinion or discuss the case. During that same period, it only admonished the jury four times to avoid media coverage.

We reject appellant's various arguments. We agree with respondent that this claim is forfeited. In any event, we determine that appellant's constitutional rights were not violated.

### *1. This claim is forfeited.*

Our Supreme Court holds that, when a defendant fails to object during trial, a defendant forfeits any argument on appeal that a trial court failed to adequately admonish a jury at each adjournment not to read, view, or listen to media coverage of the trial. (*People v. Clark* (2011) 52 Cal.4th 856, 955.) Here, appellant concedes that her defense counsel failed to request additional admonishments during the course of this trial. She also concedes that her counsel did not request the court to order the witnesses to avoid media coverage until completing their testimony. Finally, she concedes that her counsel did not request any additional measures to protect her right to a fair trial in light of the live coverage that appeared on the Internet.

Based on a failure to raise these issues below, appellant has forfeited them on appeal. (*People v. Clark, supra,* 52 Cal.4th at p. 955; see also *People v. Heard* (2003) 31 Cal.4th 946, 972, fn. 12 [failure to raise constitutional challenges at trial results in forfeiture].) In any event, we conclude that this claim fails on its merits. [Fn.26]

> [Fn.26] Because this claim fails on its merits, we do not address appellant's assertion that her trial counsel rendered ineffective assistance. Appellant cannot show that she was prejudiced by her trial counsel's performance. (See *People v. Holt, supra,* 15 Cal.4th at p. 703 [defendant not entitled to relief on claim of ineffective assistance of counsel where he made insufficient showing as to prejudice].)

### *2. Appellant's constitutional rights were not violated.*

33

Pretrial publicity by itself, even if it is pervasive and adverse, does not inevitably lead to an unfair trial. (*People v. Peterson* (2020) 10 Cal.5th 409, 440; see also *Dobbert v. Florida* (1977) 432 U.S. 282, 303 [a community's "extensive knowledge" of the criminal matter "is not sufficient by itself to render a trial constitutionally unfair"].) However, the United States Supreme Court has overturned criminal convictions when press coverage has "'utterly corrupted'" the trial atmosphere. (*Skilling v. United States* (2010) 561 U.S. 358, 380 [see opinions cited therein].) In such a situation, prejudice is presumed. (Id. at pp. 381–382.)

The Ninth Circuit Court of Appeals has adopted a two-prong test for determining when a defendant's right to jury trial under the federal Constitution has been violated by excessive and unfair publicity. (*Hart v. Stagner* (9th Cir. 1991) 935 F.2d 1007, 1014.) A defendant may show either (1) presumed prejudice because the community was saturated with inflammatory and prejudicial media publicity about the crime or (2) actual prejudice from jurors who demonstrated actual hostility or partiality that could not be set aside. (*Ibid.*)

Appellant claims that her judgment should be reversed without any showing of prejudice. She asserts that this is "an extreme case" where the media coverage "'manifestly tainted'" her trial. She insists that her trial was rendered fundamentally unfair, requiring reversal on all counts. In the alternative, she argues that the media coverage adversely impacted her trial, and reversal is warranted based on a denial of due process.

We reject appellant's arguments. Nothing demonstrates that the press coverage in this matter "utterly corrupted" the trial atmosphere so that we must presume prejudice. This trial did not occur in a very small community and nothing reasonably suggests that 12 impartial jurors could not be empaneled. (See *Skilling v. United States, supra*, 561 U.S. at p. 382.) Nothing shows that news stories about appellant contained confessions "or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." (*Ibid.*) This trial occurred about three years after Robert's murder, so there was some time for interest to wane. Finally, appellant's jury acquitted her of two felony counts. All of these circumstances counter against presuming prejudice in this matter. [Fn.27] (See *Skilling v. United States*, at pp. 382–383 [examining the relevant factors].)

> [Fn.27] These factors from *Skilling* were used, in part, to determine whether a presumption of prejudice had occurred so that a change in venue should have been ordered. (*Skilling v. United States, supra*, 561 U.S. at p. 385.) Because they were considered as part of a motion to change venue, appellant argues it is improper for this court to consider these factors in assessing whether she is entitled to a presumption of prejudice. We disagree. Although these factors were used in a different procedural context, the United States Supreme Court relied on them, at least in part, to examine whether it was necessary to presume juror prejudice from media exposure. (*Skilling, supra*, at pp. 381–382.) These factors provide some guidance in this situation.

Moreover, although this trial was shown live on the Internet, nothing demonstrates a "carnival atmosphere" had existed from intrusive media presence inside the courtroom. (See *Sheppard v. Maxwell* (1966) 384 U.S. 333, 358.) Nothing shows that the trial became confusing for the jury or the participants. (See *Estes v. Texas* (1965) 381 U.S. 532, 551.) Nothing suggests that any of the trial participants or the jurors were intimidated, harassed or improperly interviewed by the media. Nothing

establishes that the media coverage dominated the courtroom proceedings or disrupted events. Indeed, appellant concedes in her reply brief that her trial "did not have the disruptive and circus-like atmosphere in the courtroom" that was present in some of the opinions on which she relies.

Appellant contends that, although her trial was not a "spectacle" inside the courtroom, it was nevertheless tainted because of extensive media coverage and livestreaming. She raises concerns that jurors or witnesses may have viewed the extensive media coverage, and witnesses may have discussed the case with each other without a gag order from the trial court. The court, however, repeatedly admonished the jurors not to watch, read or listen to any media coverage, and the court made it clear that this was a serious concern for the court and the parties. The jurors were told on multiple occasions that they must base their decisions solely on the evidence presented in court. As such, although the court did not admonish the jury daily to avoid media coverage, we reject appellant's argument that the court did not provide adequate admonishments in this regard. We find unpersuasive her argument that prejudice must be presumed in this matter.

Finally, the California Supreme Court holds it is not proper to assume on a silent record that jurors ignored a trial court's orders and admonishments. (*People v. Westerfield* (2019) 6 Cal.5th 632, 731–732.) It is likewise impermissible for a reviewing court to assume on a silent record that jurors were exposed to prejudicial material. (*Id.* at p. 732.) To establish actual juror prejudice under federal law, a defendant "must show that a juror cannot lay aside any preconceived impression or opinion of the case and decide the case solely on the evidence." (*Willard v. Pearson* (7th Cir. 1987) 823 F.2d 1141, 1146, citing *Murphy v. Florida* (1975) 421 U.S. 794, 800.) The question is whether jurors "had such fixed opinions that they could not judge impartially the guilt of the defendant." (*Patton v. Yount* (1984) 467 U.S. 1025, 1035.)

Although approximately 41 witnesses testified in this matter, the issues surrounding appellant's guilt for the charged crimes rested largely on the credibility of two witnesses, Hearn and appellant. We will not speculate on this silent record whether the jurors and witnesses *may* have viewed the extensive media coverage, or how that exposure *may* have impacted them. In any event, this record neither demonstrates nor even reasonably suggests that either the jurors or the witnesses were impermissibly impacted by the media coverage. In fact, the opposite is true. The jury acquitted appellant of two felony charges, and it did not find true all of the alleged overt acts in support of the conspiracy charge. [Fn.28] The entire record and the jury's actions run counter to any concern that a fundamentally unfair trial occurred, or that appellant's constitutional right to an impartial jury was violated. Consequently, this claim is without merit and reversal is not appropriate.

> [Fn.28] The jury found the following three alleged overt acts *not* true: (1) Hearn had mixed arsenic with pudding; (2) Hearn had delivered the pudding with arsenic to appellant's residence; and (3) appellant had placed the pudding with arsenic in Robert's lunch.

<u>Limon</u>, 2022 WL 9799466, at *17-21.

1

a.        Procedural Default

2       Respondent contends the claim is procedurally defaulted because the state court found that

3  Petitioner had forfeited her claim by failing to request additional admonishments, failing to

4  request the court order the witnesses to avoid media coverage, and failing to request any

5  additional measures to protect her right to a fair trial.

6       As previously discussed, the Ninth Circuit has repeatedly held that California's forfeiture

7  doctrine is clear, well-established, has been consistently applied, and is an adequate and

8  independent state procedural rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002);

9  Vansickel v. White, 166 F.3d 953 (9th Cir. 1999).  Respondent is therefore correct that Petitioner

10  is procedurally barred from raising her claim, because she failed to make her requests to the trial

11  court.  Nevertheless, the claim is without merit.

12

b.        Legal Standards and Analysis

13       It is axiomatic that the Sixth Amendment guarantees criminal defendants the right to trial

14  by an impartial jury. Skilling v. United States, 561 U.S. 358, 377 (2010).  Extensive media

15  coverage may manifestly taint a criminal prosecution such that a defendant is denied her

16  constitutional right to a fair trial.  Id. at 379-384.  To demonstrate a violation of her constitutional

17  rights, a petitioner must show either presumed prejudice or actual prejudice. Id. at 377-86.

18

i.        *Presumed Prejudice*

19       The Supreme Court has made clear that presumed prejudice occurs only in extreme cases

20  as when a conviction is obtained from a trial that is entirely corrupted by press coverage. Id., at

21  380-81 (citing Murphy v. Florida, 421 U.S. 794, 798-99 (1975)). A juror's exposure to news

22  accounts of the crime alone, however, does not amount to a presumption that defendant was

23  denied due process. Id. at 380. "Prominence does not necessarily produce prejudice, and juror

24  *impartiality*, we have reiterated, does not require ignorance." Id. at 381; see also Irvin v. Dowd,

25  366 U.S. 717, 723 (1961) ("To hold that the mere existence of any preconceived notion as to the

26  guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a

27  prospective juror's impartiality would be to establish an impossible standard. It is sufficient if a

28  juror can lay aside his impression or opinion and render a verdict based on the evidence presented

in court."); <u>Reynolds v. United States</u>, 98 U.S. 145, 155-56 (1878) ("In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression of some opinion in respect to its merits.")

The doctrine of presumed prejudice is the result of three Supreme Court cases: <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963), <u>Estes v. Texas</u>, 381 U.S. 532 (1965), and <u>Sheppard v. Maxwell</u>, 384 U.S. 333 (1966). <u>See</u> <u>Skilling</u>, 561 U.S. at 379-81.  In <u>Skilling</u>, the Supreme Court noted four factors in considering whether prejudice should be presumed: 1) the size and characteristics of the community in which the crime occurred; 2) whether news reports contained a confession or other blatantly prejudice information; 3) the lapse of time between the media coverage and the trial; and 4) whether the jury's verdict undermined the supposition of juror bias. <u>Skilling</u>, 561 U.S. at 382-83.

Here, Petitioner does not contend she was denied a change of venue.  Rather, she claims the trial court should have continually admonished the jury that it must not consider material outside the trial to ensure she was not prejudiced by media coverage.  She contends the trial court failed to instruct the jury on a daily basis to ignore media coverage of the trial.

In its review of the claim, the appellate court applied the correct legal standard. It considered the various factors set forth in <u>Skilling</u> and determined that prejudice could not be presumed.  The state court noted that the trial did not occur in a small community.  It noted that there were no news stories containing a confession or other blatantly prejudicial evidence. The court further noted that the trial occurred three years after the murder, which was sufficient time for interest to wane.  Finally, the court noted that Petitioner was acquitted of two felony counts. Therefore, the verdict undermined Petitioner's claim that the jury was biased.  <u>See</u> <u>United States v. Arzola–Amaya</u>, 867 F.2d 1504, 1514 (5th Cir. 1989) ("The jury's ability to discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues and reinforces our belief and conclusion that the media coverage did not lead to the deprivation of [the] right to an impartial trial.").

Petitioner fails to show that the state court's decision was objectively unreasonable.  As correctly noted by Respondent, the trial took place in Kern County, not a small community.  Of the 104 potential jurors in voir dire, only 16 jurors indicated they had been affected by pretrial media coverage, and all 16 were excused. (Doc. 10-1 at 93-94.)  Petitioner also fails to show the existence of any news story containing a confession or other blatantly prejudicial information.  Likewise, Petitioner fails to show how a period of three years between the murder and the trial was not sufficient for interest to wane.  Finally, given that the jury acquitted her of two felony counts, Petitioner has not shown that the jury was unable to fairly consider the issues before it.  Petitioner's claim of presumed prejudice from media coverage fails.

### ii.      *Actual Prejudice*

Alternatively, the standard of "actual prejudice" examines the jury voir dire to determine if, notwithstanding jurors' assurances of impartiality, the record compels an inference that jurors were not impartial. Murphy v. Florida, 421 U.S. 794, 799-803 (1975). A defendant may prove actual prejudice if "during voir dire, potential jurors who have been exposed to pretrial publicity express bias or hostility toward the defendant that cannot be set aside." Murray, 882 F.3d at 802-03. Trial courts, however, have "wide discretion in conducting voir dire regarding pretrial publicity and other areas that might reveal juror bias. Mu'Min v. Virginia, 500 U.S. 415, 427 (1991). A reviewing court should defer to the trial court's impartiality determination because "[t]he judge of that court sits in the locale where the publicity is said to have had its effects and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror." Id.

Here, the state court applied the correct governing legal principles in denying the claim. In rejecting the claim, the state court reasonably determined that Petitioner failed to demonstrate actual prejudice from the media coverage.  The appellate court noted a complete dearth of any evidence showing jurors were improperly exposed to prejudicial material.  Indeed, the record shows the opposite.  The jury acquitted Petitioner of two felony counts showing it was able to fairly consider the evidence presented. The claim should be denied.

1    4.    <u>Claim Four</u>

2    In her final claim for relief, Petitioner contends her sentence was grossly disproportionate

3    to her individual culpability and constitutes cruel and unusual punishment in violation of the

4    Eighth Amendment. Petitioner also raised this claim on direct appeal.  The Fifth DCA denied the

5    claim as follows:

> In count 6, appellant was sentenced to a determinate prison term of 16 months (the
> low term) for being an accessory after this murder. This sentence was imposed
> consecutively to the sentence in count 1, wherein she received an indeterminate
> term of 25 years to life for murder. In the present claim, appellant asserts that her
> sentence represents cruel and unusual punishment under both the federal and
> California Constitutions. She contends that her sentence is grossly disproportionate
> to her individual culpability. She asserts that her sentence should be stricken, and
> this matter remanded to the trial court with directions for it "to impose a sentence
> that is proportionate" to her culpability. We disagree. As an initial matter, this
> claim is forfeited. In any event, it also fails on its merits.
>
> *A. This claim is forfeited.*
>
> As appellant concedes, she did not raise this constitutional claim when the trial
> court imposed her sentence. "A claim a sentence is cruel and unusual is forfeited
> on appeal if it is not raised in the trial court, because the issue often requires a fact-
> bound inquiry." (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247.)
> Appellant's failure to raise this constitutional issue below results in its forfeiture on
> appeal. (*People v. Gamache* (2010) 48 Cal.4th 347, 403 [defendant forfeited
> various claims under due process and Eighth Amendment by failing to object
> below]; *People v. Mungia* (2008) 44 Cal.4th 1101, 1140–1141.) She cannot argue
> that the trial court erred in failing to conduct an analysis it was not asked to
> conduct. (See *People v. Partida, supra*, 37 Cal.4th at p. 435.) As such, this claim is
> forfeited. In any event, however, we also conclude that this claim fails on its
> merits. [Fn.38]
>
>> [Fn.38] Because we also address and reject this claim on its merits, we
>> need not address any alleged ineffective assistance of counsel. Appellant
>> cannot show she was prejudiced by her trial counsel's performance. (See
>> *People v. Holt, supra*, 15 Cal.4th at p. 703 [defendant not entitled to relief
>> on claim of ineffective assistance of counsel where he made insufficient
>> showing as to prejudice].)
>
> *B. This claim fails on its merits.*
>
> Appellant argues that her limited personal culpability in this matter, coupled with
> her lack of danger to society, demonstrates that her sentence constitutes cruel and
> unusual punishment. She contends that, other than providing Hearn with
> information about the location of Robert's shop in Tehachapi and informing Hearn
> that Robert would be working there on August 17, 2014, there was no
> corroboration of Hearn's testimony that she did anything further to aid and abet in
> this murder. She asserts that, unlike her, Hearn is an extremely dangerous person,
> and it is outrageous that she received a longer sentence. [Fn.39] She notes that she
> has two minor children, and she contends that she will not be eligible for parole
> until 2036, while Hearn will be eligible for parole commencing in 2028. [Fn.40]

39

She maintains that this is a unique case wherein her sentence both "'shocks the conscience' and 'offends fundamental notions of human dignity.'"

[Fn.39] Hearn informed the jury that, pursuant to his plea agreement, he would receive a prison sentence of 25 years four months based on a conviction for voluntary manslaughter with a firearm enhancement. He was originally charged with first degree murder, along with a special circumstance allegation of lying in wait. He initially faced an indeterminate prison sentence of life without the possibility of parole or death, but the prosecution waived the death penalty before the plea agreement was reached.

[Fn.40] The California Department of Corrections and Rehabilitation (CDCR) online inmate locator reflects that Hearn is currently eligible for parole in November 2028 as a "youth offender." (<CDCR Inmate Information (ca.gov)> [as of Oct. 14, 2022].) The same site shows that appellant is eligible for parole in December 2033. (<CDCR Inmate Information (ca.gov)> [as of Oct. 14, 2022].) On this court's own motion, we take judicial notice of these facts. (Evid. Code, § 452, subd. (h) [courts can take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy"]; see also *People v. Seumanu* (2015) 61 Cal.4th 1293, 1372–1373 [courts can take judicial notice of facts from Web site maintained by CDCR].)

We reject all of appellant's various arguments. The Eighth Amendment of the United States Constitution prohibits the infliction of "cruel and unusual" punishments. [Fn.41] (*In re Alva* (2004) 33 Cal.4th 254, 266.) Likewise, article I, section 17, of the California Constitution prohibits the infliction of "'[c]ruel or unusual'" punishments. [Fn.42] (*In re Alva, supra*, 33 Cal.4th at p. 266.) A punishment violates the Eighth Amendment of the United States Constitution if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173.) Similarly, a punishment may violate article I, section 17, of the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*), superseded by statute on other grounds as explained in *In re Palmer* (2021) 10 Cal.5th 959, 974.)

[Fn.41] The guarantee of the Eighth Amendment applies to the states through the Fourteenth Amendment of the United States Constitution. (*Rhodes v. Chapman* (1981) 452 U.S. 337, 344–345.)

[Fn.42] The California Supreme Court has "never suggested that article I, section 17 employs a different or broader definition of 'punishment' itself than applies under the Eighth Amendment." (*In re Alva, supra*, 33 Cal.4th at p. 291.)

Three criteria are used to determine whether a sentence is "cruel or unusual" under article 1, section 17, of the California Constitution: (1) the nature of the offense and the offender (with particular attention to the degree of danger both factors may pose to society); (2) a comparison of the sentence with those for other more serious offenses under California law; and (3) a comparison of the sentence with those in other states for the same offense. (*Lynch, supra*, 8 Cal.3d at pp. 425–427.) Proportionality may be shown by any of the three relevant factors. (*People v.

*Dillon* (1983) 34 Cal.3d 441, 487, fn. 38 (plur. opn. of Mosk, J.).) A defendant bears a "considerable burden" of proof to establish one of these factors. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.)

Although appellant received a longer prison sentence than Hearn, that does not factor into our analysis. It is not appropriate to consider the length of a coconspirator's sentence when examining whether a particular sentence represents cruel and unusual punishment. (See *People v. Debose* (2014) 59 Cal.4th 177, 212; *People v. Thomas, supra*, 54 Cal.4th at pp. 940–941.) As such, we decline to examine whether or not appellant's and Hearn's respective sentences are improperly disproportionate.

In considering whether appellant's punishment is constitutionally impermissible, we must view the underlying disputed facts in the light most favorable to her judgment. (*People v. Em* (2009) 171 Cal.App.4th 964, 971; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 569; *People v. Martinez* (1999) 76 Cal.App.4th 489, 496.) In addition to being convicted of first degree premeditated murder (count 1) based on a theory of aiding and abetting, the jury also convicted her of (1) conspiracy to commit murder (§ 182, subd. (a)(1); count 2); (2) solicitation to commit murder (§ 653f, subd. (b); count 3); and (3) being an accessory to the murder (§ 32; count 6). Viewing the facts in the light most favorable to these convictions, appellant told Hearn to kill her husband, they agreed to work together towards that goal, she provided Hearn with critical information about where and when to find Robert working alone in Tehachapi, she lied to law enforcement after this murder to conceal her relationship with Hearn, and she provided false leads to law enforcement during its investigation.

When viewed in the light most favorable to the judgment, appellant's behavior cannot be described as minor or insignificant. Although appellant had no prior criminal record, we cannot declare that her punishment violates the Eighth Amendment of the United States Constitution. The statutory sentence of 25 years to life for her conviction of premeditated first degree murder neither demonstrates an "unnecessary and wanton infliction of pain" nor is it "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia, supra*, 428 U.S. at p. 173.) Likewise, her sentence does not violate article I, section 17, of the California Constitution because it is not "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch, supra*, 8 Cal.3d at p. 424.)

"In our tripartite system of government, the legislative branch defines crimes and prescribes punishment." (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1145.) It is rare when an appellate court may declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive. (*Ibid.*)

In this matter, our independent review demonstrates that appellant's punishment is neither cruel nor unusual based on the facts viewed in the light most favorable to the judgment. Accordingly, we reject appellant's constitutional challenges to the imposition of her sentence, and resentencing is not appropriate.

<u>Limon</u>, 2022 WL 9799466, at *28-30.

a.      <u>Legal Standard and Analysis</u>

The Eighth Amendment provides that cruel and unusual punishments shall not be

inflicted.  U.S. Const. amend. VIII.  A sentence constitutes cruel and unusual punishment if it is "grossly disproportionate" to the crimes committed.  Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (holding that a California state court's affirmance of two consecutive twenty-five-years-to-life sentences for petty theft was not grossly disproportionate and not contrary to nor an unreasonable application of federal law); see also Ewing v. California, 538 U.S. 11 (2003) (holding that a sentence of twenty-five-years-to-life for theft under California's three strikes law was not cruel and unusual punishment); Harmelin v. Michigan, 501 U.S. 957, 961 (1991) (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality); Rummel v. Estelle, 445 U.S. 263, 271 (1980). Outside of the capital punishment context, the Eighth Amendment prohibits only sentences that are extreme and grossly disproportionate to the crime.  United States v. Bland, 961 F.2d 123, 129 (9th Cir.1992) (quoting Harmelin, 501 U.S. at 1001).  When reviewing an Eighth Amendment claim in a federal habeas corpus petition, the gross disproportionality principle is "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework" under 28 U.S.C. § 2254(d)(1). Lockyer, 538 U.S. at 73.  The "gross disproportionality rule" applies "only in the 'exceedingly rare' and 'extreme' case." Lockyer, 538 U.S. at 72–73; Rummel, 445 U.S. at 272.  So long as a sentence does not exceed statutory maximums, it will not be considered cruel and unusual punishment under the Eighth Amendment. See United States v. Mejia-Mesa, 153 F.3d 925, 930 (9th Cir.1998); United States v. McDougherty, 920 F.2d 569, 576 (9th Cir.1990).

In assessing the compliance of a non-capital sentence with the proportionality principle, a reviewing court must consider "objective factors" to the extent possible.  Solem, 463 U.S. 277, 290 (1983).  Foremost among these factors are the severity of the penalty imposed and the gravity of the offense.  Id. at 290–91.  If "a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality," the reviewing court should compare the sentence with sentences imposed on other criminals in the same jurisdiction and for the same crime in other jurisdictions.  Harmelin, 501 U.S. at 1005.  "Comparisons among offenses can be made in light of, among other things, the harm caused or threatened to the victim

1  or society, the culpability of the offender, and the absolute magnitude of the crime." <u>Taylor</u>, 460

2  F.3d at 1098.  If a comparison of the crime and the sentence does not give rise to an inference of

3  gross disproportionality, a comparative analysis is unnecessary.  <u>Id</u>.

4         The Court finds no inference of gross disproportionality from the present record.  As

5  noted by the state court, Petitioner was found guilty of first degree premeditated murder,

6  conspiracy to commit murder, and solicitation to commit murder.  Petitioner's indeterminate

7  sentence of 25 years to life cannot credibly be considered grossly disproportional to her crimes.

8  The state court determination that Petitioner's sentence did not constitute cruel and unusual

9  punishment was not contrary to or an unreasonable application of Supreme Court precedent.  The

10 claim should be rejected.

11 **IV.     RECOMMENDATION**

12         Based on the foregoing, the Court RECOMMENDS that the Petition for Writ of Habeas

13 Corpus be DENIED with prejudice on the merits.

14         This Findings and Recommendation is submitted to the United States District Court Judge

15 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

16 Local Rules of Practice for the United States District Court, Eastern District of California.  Within

17 thirty (30) days after being served with a copy of this Findings and Recommendation, any party

18 may file written objections with the Court and serve a copy on all parties.  Such a document

19 should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

20 to the Objections shall be served and filed within fourteen (14) court days (plus three days if

21 served by mail) after service of the Objections.  The Court will then review the Magistrate

22 Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file

23 objections within the specified time may waive the right to appeal the Order of the District Court.

24 <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  This recommendation is not an order that is

25 immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to

26 /////

27 /////

28 /////

Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

IT IS SO ORDERED.

Dated:   **July 29, 2024**                                    /s/ *Sheila K. Oberto*
                                                            UNITED STATES MAGISTRATE JUDGE